**SOFAMOR DANEK GROUP, INCORPORATED,**
Appellant,

v.

**Clifton R. GAUS, Administrator, Agency for Health Care Policy and Research, Department of Health and Human Services, et al., Appellees.**

No. 94–5356.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1995.

Decided Aug. 4, 1995.

James D. Miller, Washington, DC, argued the cause, for appellant. With him on the briefs, were Edward M. Basile and Paul J. Larkin, Jr., Washington, DC.

Howard S. Scher, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for appellees. With him on the brief, were Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., and Mark B. Stern, Atty., U.S. Dept. of Justice, Washington, DC. Eric D. Goulian, Atty., U.S. Dept. of Justice, Washington, DC, entered an appearance.

Daniel J. Popeo and Paul D. Kamenar, Washington, DC, were on the brief, for amicus curiae Washington Legal Foundation.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The court must decide whether a panel of experts and consumers convened by the Agency for Health Care Policy and Research to develop a clinical practice guideline on the treatment of lower back pain for health care practitioners was an "advisory committee" under the Federal Advisory Committee Act, 5 U.S.C.App. §§ 1–15 ("FACA"). Appellant Sofamor Danek, Inc. maintains that the Low Back Panel was an advisory committee and that the federal government must discontinue distribution of and reliance on the *Clinical Practice Guideline on Acute Low Back Problems in Adults* because it was not developed in compliance with FACA requirements. The district court granted summary judgment for appellees, ruling that the Low Back Panel was not a FACA advisory committee because it was not established or utilized "in the interest of obtaining advice or recommendations for ... the Federal Government." 5 U.S.C.App. § 3(2). We affirm. 870 F.Supp. 379.

**I.**

The Low Back Panel was established pursuant to the Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 6103, 103 Stat. 2106, 2189–2208 ("OBRA"). As part of OBRA, Congress created the Agency for Health Care Policy and Research ("Research Agency").[1] Congress gave the Research Agency a mandate to improve health care "through the establishment of a broad base of scientific research and through the promotion of improvements in clinical practice ... and in the organization, financing, and delivery of health care services."[2] The Research Agency is to arrange for:

the development and periodic review and updating of—

(1) clinically relevant guidelines that may be used by physicians, educators, and health care practitioners to assist in determining how diseases, disorders, and other health conditions can most effectively and

---

1. The Research Agency is part of the Public Health Service in the Department of Health and Human Services. 42 U.S.C. §§ 202, 299(a). Many of its responsibilities for developing guidelines are carried out by the Office of the Forum for Quality and Effectiveness in Health Care ("the Forum"). *Id.* § 299b. For ease of reference, we generally refer to the Research Agency.

2. *Id.* § 299(b).

appropriately be prevented, diagnosed, treated, and managed clinically; and

(2) standards of quality, performance measures, and medical review criteria through which health care providers and other appropriate entities may assess or review the provision of health care and assure the quality of such care.[3]

To accomplish this goal, Congress authorized the Research Agency both to contract with public and private nonprofit entities and to convene panels of experts and consumers.[4] When the Research Agency convenes a panel, it publicly seeks nominations and then selects the members of the panel after consultation with interested individuals and groups.[5] The panel members must include physicians and health care practitioners representing varying interests, including relevant specialties, as well as two persons who do not derive their livelihood from treating the health condition addressed.[6] While the Research Agency determines the health condition that the clinical practice guideline will address, the panel determines the scope and content of the guideline; neither the Research Agency nor anyone in the Department of Health and Human Services ("HHS") can modify or disapprove the guideline developed by a panel.[7] The Research Agency's role is to support the process for development and periodic review of the guidelines,[8] ensure that the panels use an evidence-based methodology,[9] publish and disseminate the guidelines,[10] pilot test them in a clinical setting,[11] and evaluate their effect on the clinical practice of medicine.[12]

Pursuant to this statutory scheme, the Research Agency established a twenty-three member panel to develop a clinical practice guideline for low back disorders.[13] Thereafter, the Low Back Panel held a public meeting to allow interested persons to present information orally and in writing.[14] Sofamor Danek, a manufacturer of medical devices used in back surgery, declined to participate despite an invitation from the Research Agency to provide information to the Panel. The Panel ultimately developed the *Clinical Practice Guideline on Acute Low Back Problems in Adults,* which was published on December 8, 1994. Sofamor filed suit for declaratory and injunctive relief, and the district court granted summary judgment for appellees. Sofamor Danek appeals; our review is *de novo.*[15]

## II.

■ Congress enacted FACA in 1976 to address problems created by the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch...."[16] The statute has two principal purposes: "to enhance the public accountability of advisory committees established by the Executive Branch and to

3. *Id.* § 299b–1(a).

4. *Id.* §§ 299b–1(c), –2(a).

5. *Id.* § 299b–2(c).

6. *Id.*

7. *Id.* § 299b–3(a)(1)(A). The House Report on OBRA noted that:

 There is a broad consensus that the Federal government should not develop these guidelines. The [Research Agency] satisfies this concern, since no one in the [Research Agency] or the Department of HHS would have any authority to review, modify, approve or disapprove the guidelines developed by panels or contractors. On the other hand, the Committee believes it is essential that there be a focal point for this activity and that a Federal official be held accountable to make sure the activity is carried out properly.

H.R.Rep. No. 247, 101st Cong., 1st Sess. 378, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2104.

8. 42 U.S.C. §§ 299b–1(a)(1), –2(a).

9. *Id.* § 299b–1(b)(1).

10. *Id.* § 299b–3(c).

11. *Id.* § 299b–3(d).

12. *Id.* § 299b–3(e).

13. 56 Fed.Reg. 11,452–11,453 (March 18, 1991).

14. 57 Fed.Reg. 32,991–32,992 (July 24, 1992).

15. *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994).

16. 5 U.S.C.App. § 2(a).

reduce wasteful expenditures on them." [17] *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 459, 109 S.Ct. 2558, 2569, 105 L.Ed.2d 377 (1989). FACA defines an advisory committee as:

> any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof ... which is—
>
> (A) established by statute or reorganization plan, or
>
> (B) established or utilized by the President, or
>
> (C) established or utilized by one or more agencies,
>
> *in the interest of obtaining advice or recommendations* for the President or one or more agencies or officers of the Federal Government.... [18]

Notwithstanding the "almost unfettered breadth" of this definition, *Public Citizen,* 491 U.S. at 452 n. 8, 109 S.Ct. at 2566 n. 8, Congress did not intend for FACA to apply to "every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Id.* at 453, 109 S.Ct. at 2566. In considering a committee of the American Bar Association, the Supreme Court had occasion to interpret narrowly the phrase "establish or utilize" to encompass only those advisory committees established by or for an agency. *See id.* at 462, 109 S.Ct. at 2570. In so doing the Court made clear that mere subsequent and optional use of the work product of a committee by a federal entity does not involve utilization under FACA. *Id.* at 452, 109 S.Ct. at 2565. The Court noted that under FACA § 2(b)(6), the work of an advisory committee is to be "exclusively advisory in nature." *Id.* at 446, 109 S.Ct. at 2563.

Sofamor Danek contends that the Low Back Panel was established by OBRA, and that the *Clinical Practice Guideline on Acute Low Back Problems in Adults* will be utilized by federal agencies and officials, including the Research Agency and the Health Care Financing Administration ("HCFA"), which administers the Medicare and Medicaid programs. Therefore, Sofamor Danek maintains, the Panel was established and utilized, at least in part, in the interest of obtaining advice for HCFA, and appellees should be enjoined from further dissemination of the *Guideline* and any reliance on it. Because the Low Back Panel was established by the federal government within the meaning of FACA, the dispositive issue as to establishment is whether the Panel's purpose was to provide "advice or recommendations" to HCFA or other federal entities. In light of Congress' stated purpose for the clinical practice guidelines and the absence of evidence of additional, unstated purposes, and because we find no convincing evidence that HCFA or any other agency "utilized" the Low Back Panel to obtain "advice or recommendations," we conclude that FACA does not apply to the Low Back Panel that developed the *Guideline on Acute Low Back Pain in Adults.*

■ Congress stated in OBRA that it created a system for developing clinical practice guidelines in order to "promot[e] the quality, appropriateness, and effectiveness of health care...." [19] Toward that end, OBRA instructed the Research Agency (through the Forum) to develop guidelines that "may be used by physicians, educators, and health care practitioners to assist in determining how diseases, disorders, and other health conditions can most effectively and appropriately be prevented, diagnosed, treated, and managed clinically." [20] The statute requires the guidelines to be "in formats appropriate for use by physicians, health care practitioners, providers, medical educators, and medi-

---

17. Thus, FACA requires that an advisory committee file a charter, § 9(c); have members [who] are "fairly balanced in terms of the points of view represented and the functions to be performed," § 5(b)(2); give advance notice of its meetings, which shall be open to the public, § 10(a)(1) & (2); and keep minutes of its meetings, § 10(c), which, along with reports and records, are to be available to the public unless excepted under the Freedom of Information Act,

§ 10(b). It is undisputed that the Low Back Panel did not comply with FACA's public access requirements.

18. *Id.* § 3(2) (emphasis added).

19. 42 U.S.C. § 299b–1(a).

20. *Id.* § 299b–1(a)(1).

cal review organizations and in formats appropriate for use by consumers of health care...."[21] This purpose is reflected as well in the legislative history, which states that "the guidelines are intended to help physicians provide services in a more effective and appropriate manner."[22] The Research Agency implemented the statutory purpose when it prepared program notes for the panels and, specifically, when it announced the creation of the Low Back Panel for the purpose of developing "clinically relevant guidelines that may be used by physicians, educators, and health care practitioners."[23] For these reasons, we agree with appellees that Congress authorized, and the Research Agency created, the Low Back Panel to provide advice to private health care practitioners, and not to the federal government. *Cf. Center for Auto Safety v. Cox,* 580 F.2d 689, 692–93 (D.C.Cir.1978) (distinguishing between a committee that exists in significant part "to offer advice, often solicited, to the federal government," and a mere "clearinghouse for the transmission of views and ideas") (citation omitted).

Sofamor Danek does not dispute that one purpose of the Low Back Panel was to provide advice for physicians and health care professionals outside the federal government. Rather, it contends that Congress, in authorizing the panels in OBRA, had the additional purpose of providing advice to the HHS Secretary regarding Medicare reimbursement policy, and that this purpose makes FACA applicable to the Low Back Panel. Sofamor Danek relies on several OBRA provisions indicating that Congress intended the panels to address medical conditions of importance to the Medicare program. Thus, OBRA requires the Research Agency to consult with HCFA in setting an agenda for the development of guidelines on specific health problems.[24] OBRA also requires the Research Agency to develop initial guidelines by January 1, 1991, for at least three "clinical treatments or conditions that [*inter alia* ] account for a significant portion of expenditures under [the Medicare program],"[25] and a set of guidelines by January 1, 1996, "that address the prevention of not fewer than three conditions that account for significant national health expenditures."[26] In addition, OBRA requires the HHS Secretary to assure that the panels' activities appropriately reflect the priorities of Medicare, at least in part through consultation with HCFA.[27]

■ Sofamor Danek's dual-purpose contention fails to appreciate the distinction noted by Congress when enacting FACA between the purpose for establishing a committee and the government's subsequent and optional use of a committee's work product. In terms used by Congress, the Low Back Panel is operational, developing guidelines for health care practitioners, rather than advisory to the federal government, and so not covered by FACA.[28] The OBRA provisions

---

**21.** *Id.* § 299b–1(b)(2).

**22.** H.R.Rep. No. 101–247, at 378, 1989 U.S.C.C.A.N. at 2104.

**23.** 56 Fed.Reg. at 11,452; *accord* 57 Fed.Reg. at 32,991 (notice of public meeting); *see also* Research Agency Program Note: Clinical Practice Guideline Development 1 (August 1993).

**24.** 42 U.S.C. § 299b–3(a)(2)(B).

**25.** *Id.* § 1320b–12(a)(3)(A); *accord id.* § 299b–1(d).

**26.** *Id.* § 299b–1(f).

**27.** *Id.* §§ 299b–1(e), 299b–3(a)(2)(B), 1320b–12(a)(1)(B), 1320b–12(b)(3). *See also* 60 Fed. Reg. 26,886, 26,886 (May 19, 1995) (criterion in determining health conditions to be addressed by the guidelines is "the economic burden posed by the prevention, diagnosis, treatment, and clinical management of a health condition, including the impact on publicly funded programs"); 58 Fed. Reg. 49,308–49,309 (September 22, 1993) (same); *Research Agency Program Note: Clinical Practice Guideline Development* 2 (August 1993) ("[s]pecific needs of the Medicare and Medicaid populations" is one factor in selecting guideline topics).

**28.** *See* H.R. Rep. No. 1017, 92d Cong., 2d Sess. 4, *reprinted in* 1972 U.S.C.C.A.N. 3491, 3494 ("The term advisory committee as used in this bill does not include committees or commissions which have operational responsibilities. Only those committees established for the purpose of obtaining advice are within the bill's definition."); S.Rep. No. 1098, 92d Cong., 2d Sess. 8 (1972) (if a committee is "primarily operational, rather than advisory," it is not covered by FACA); 41 C.F.R. § 101–6.1004(g) (same); *see also Natural Resources Defense Council v. EPA,* 806 F.Supp. 275, 278 (D.D.C.1992); *Public Citizen v. Commission*

referring to the Medicare program on which Sofamor Danek relies merely indicate that Congress intended the clinical practice guidelines to address health conditions of importance to the Medicare program. It does not necessarily follow, as Sofamor suggests, that Congress intended a panel like the Low Back Panel to provide advice to HCFA and other government entities. Advice on the agenda for the development of guidelines flows from HCFA to the Research Agency; Sofamor Danek points to nothing in the statute that requires HCFA to consider the *Clinical Practice Guideline on Acute Low Back Problems in Adults* in developing Medicare reimbursement policy. To the extent that health care practitioners use the *Guideline* to treat more efficiently health conditions for which Medicare expends substantial funds, the *Guideline* presumably will benefit the Medicare program.[29] Indeed, the extent of this effect appears to be what Congress wanted to determine when it instructed the Research Agency to report on the impact of the initial guidelines on at least three health conditions which account for significant Medicare expenditures or otherwise meet the needs and priorities of the Medicare program.[30] Thus, in creating the guideline system, the Medicare program could benefit without any offi-

cer or agency of the federal government obtaining "advice or recommendations."

Congress expressly stated the purpose for the establishment of the panels—improving health care by developing, reviewing, and updating guidelines for use by clinical health care practitioners.[31] In light of that express purpose, the court will not lightly infer any other purpose, such as reducing health care costs by giving advice to the Secretary regarding Medicare reimbursement policy. *Cf. Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 517–18, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) ("Such reasoning is a variant of the familiar principle of *expressio[ ] unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *Freightliner Corp. v. Myrick*, —— U.S. ——, ——, 115 S.Ct. 1483, 1488, 131 L.Ed.2d 385 (1995) (inference discussed in *Cipollone* is rebuttable). Although HCFA may consult the *Clinical Practice Guideline on Acute Low Back Problems in Adults* when setting Medicare reimbursement policy,[32] and Congress may have intended that HCFA do so,[33] it does not follow that Congress' purpose in authorizing the panels to develop a clinical practice guideline like the *Guideline on Acute Low Back Problems in Adults* was to

---

on the Bicentennial, 622 F.Supp. 753, 758 (D.D.C.1985); *HLI Lordship Indus., Inc. v. Committee for Purchase from Blind and Other Severely Handicapped*, 615 F.Supp. 970, 978 (E.D.Va. 1985) (ruling FACA inapplicable to committee whose "advisory capacity is secondary to its operational activities"), *rev'd on other grounds*, 791 F.2d 1136 (4th Cir.1986).

**29.** *See* 58 Fed.Reg. 12,042–12,043 (March 2, 1993) (HCFA, through contracts with Peer Review Organizations, attempts to "eliminate unreasonable, unnecessary and inappropriate care provided to Medicare beneficiaries" and to ensure that Medicare services meet "professionally recognized standards of health care.").

**30.** 42 U.S.C. § 1320b–12(a)(3).

**31.** *Id.* § 299b–1(a).

**32.** Thomas Hoyer, the Acting Director of the Office of Coverage and Eligibility Policy in the Bureau of Policy Development in HCFA, stated that in examining "the widest possible scope of information and opinion," HCFA "may also review clinical practice guidelines, including those

developed under the sponsorship of [the Research Agency]....'' Joint Appendix at 273.

**33.** The OBRA Conference Report states, in regard to establishment of the Research Agency, that:

The conferees intend, that to the extent appropriate, the Secretary use the information and practice guidelines ... to enhance the quality of care provided through [Medicare and Medicaid]. The Secretary shall also assimilate the research findings, practice guidelines and other information ... to improve the efficiency and effectiveness of the Medicare and Medicaid programs.

The conferees intend that the research findings and guidelines ... be reflected in the ... payment determinations, and other utilization review activities. Further, it is intended that the Secretary ensure that the research and guidelines programs be responsive to the needs and priorities that may arise from implementation of physician payment reform under this Act.

H.R.CONF.REP. No. 386, 101st Cong., 1st Sess. 893, *reprinted in* 1989 U.S.C.C.A.N. 3018, 3496.

provide advice or recommendations to the Secretary or HCFA. Had Congress stated in the statute that the clinical practice guidelines were designed to provide advice or recommendations regarding HCFA policy, Sofamor Danek would likely have a stronger case. But neither Congress nor the Research Agency identified such a purpose for the Low Back Panel. Absent that, Sofamor Danek's argument that Congress' unstated purpose was for the *Clinical Practice Guideline on Acute Low Back Problems in Adults* to function as advice or recommendations to HCFA is met by the express statement of Congressional purpose.[34]

Put otherwise, Sofamor Danek's dual-purpose contention confuses the specific ills on which FACA is focused—the existence of advisory committees involving "the wasteful expenditure of public funds for worthless committee meetings and biased proposals," *Public Citizen,* 491 U.S. at 453, 109 S.Ct. at 2566—with the use by federal entities of data specifically developed for another purpose. That HCFA, subsequent to the deliberations of the Panel, considers a clinical practice guideline does not show that the Low Back Panel was "established or utilized ... in the interest of obtaining advice or recommendations for ... the Federal Government."[35] Earlier decisions by both the Supreme Court and this court, in considering an entirely private organization, a government contractor, and an Article III entity, have interpreted the term "utilized" in FACA narrowly, to mean "something along the lines of actual management or control of the advisory committee." *Washington Legal Foundation v. United States Sentencing Comm'n,* 17 F.3d 1446, 1450 (D.C.Cir.1994) (Article III entity); *see also Public Citizen,* 491 U.S. at 461–62, 109 S.Ct. at 2570–71 (Committee of the American Bar Association); *Food Chemical News v. Young,* 900 F.2d 328, 332–33 (D.C.Cir.) (private contractor), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 99 (1990).[36] When "utilized" is so defined, FACA can only apply if the committee is established, managed, or controlled for the purpose of obtaining advice or recommendations for the federal government. Here the only entities which have arguably established, managed, or controlled the Low Back Panel are Congress and the HHS Secretary through the Research Agency, so it is their intent that controls. But even if "utilization" does not require control in every instance, as where a committee is authorized by Congress and appointed and funded by an executive branch agency, there is nothing in the record to show that at the time the Low Back Panel was appointed HCFA or any other federal agency intended to use the Panel's guidelines as recommendations to formulate policy. Again, mere subsequent and optional use of the guideline work product by HCFA or another federal agency does not implicate FACA.

Consequently, in view of the express statement by Congress on the purpose of the clinical practice guidelines, and the reflection of that purpose by the Research Agency in convening the Low Back Panel, the court has no occasion to infer another intent by Congress or the HHS Secretary. That the *Guideline* may, in turn, be considered along with other data in the administration of the Medicare program or other federal programs is a secondary effect of Congress' decision that guidelines should be developed for clinical health care practitioners in order to improve the quality of health care. It does not, in the absence of Congressional intent (or

34. *See Nader v. Baroody,* 396 F.Supp. 1231, 1234 (D.D.C.1975) (only committees "directed to make recommendations on an identified governmental policy for which specified advice was being sought" are subject to FACA); *Public Citizen v. Commission on the Bicentennial,* 622 F.Supp. at 757–58 (committee primarily operational where the statute does not refer to it as an advisory committee and its enumerated duties do not include providing advice or recommendations to the federal government).

35. 5 U.S.C.App. § 3(2)(A).

36. Amicus' contention that this narrow definition of "utilize" is confined to circumstances where a court seeks to avoid a difficult constitutional issue, *see Public Citizen,* 491 U.S. at 465–67, 109 S.Ct. at 2572–73; *Association of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 906 (D.C.Cir.1993) (dictum), is unpersuasive in light of *Food Chemical News,* 900 F.2d at 332–33, where the court concluded that the *Public Citizen* definition of "utilize" was controlling despite the absence of a constitutional issue.

Research Agency intent) that the *Guideline* function as advice or recommendations to the federal government, or of evidence that HCFA, at the time the Panel was deliberating, intended to use and did, in fact, make use of the Panel's recommendations to formulate policy, make the Low Back Panel a FACA advisory committee.

 The conclusion that the Low Back Panel was not intended to provide advice or recommendations to the HHS Secretary or HCFA is supported by comparing it with groups that do constitute FACA advisory committees. For example, Sofamor Danek maintains that the Low Back Panel is analogous to advisory panels established by the HHS Secretary with respect to the categorization of medical devices, and that we should infer that these panels are covered by FACA because Congress has exempted them from the FACA sunset provision.[37] But the applicability of FACA to the medical devices panels is apparent from Congress' express statement that their purpose is to provide recommendations to the HHS Secretary.[38] By contrast, OBRA and the Research Agency have indicated that the purpose of the Low Back Panel is to develop a clinical practice guideline for the use of health care practitioners, quite apart from any other use that may be made of the *Guideline*. The distinction between the Low Back Panel and a FACA advisory committee is further suggested by the fact that in the same section of OBRA authorizing the guideline panel system, Congress also created the Advisory Council for Health Care Policy, Research, and Evaluation for the purpose of advising the Secretary and providing recommendations to the Research Agency.[39] As with the medical devices panels, Congress acknowledged the applicability of FACA in providing that the Advisory Committee was exempted from FACA's sunset provision.[40] Because

Congress knew how to state that it was establishing an advisory committee and did not do so here, the reasonable inference is that it did not intend for FACA to apply to guideline panels. *Cf. Central Bank of Denver v. First Interstate Bank, N.A.,* — U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994). Thus, the contrast between the Low Back Panel and the Advisory Council further supports the conclusion that Congress intended a panel like the Low Back Panel to develop guidelines for the use of health care practitioners, with likely secondary uses by federal entities such as HCFA, and not for the purpose of providing advice or recommendations for the federal government. Had another purpose been intended it seems unlikely that Congress would have required, much less that the Research Agency would have sponsored, the *Clinical Practice Guideline on Acute Low Back Problems in Adults* in a format for use by individual decision-makers—physicians, educators, and consumers.

 Finally, we are unpersuaded by Sofamor Danek's suggestions that this interpretation of Congress' intent would lead to absurd results. Sofamor Danek suggests that if FACA is inapplicable to the Low Back Panel, an agency can easily circumvent FACA by establishing an advisory committee with a stated purpose other than rendering advice or recommendations to the federal government. The holding in the instant case permits no such subterfuge because it rests on an express statement of congressional intent.[41] Given its power to exempt advisory committees from FACA, Congress has no reason to dissemble about its purpose. It does not necessarily follow that a similar statement of purpose by an agency acting without instruction from Congress would have the same effect; unlike Congress, a

37. 5 U.S.C.App. § 14.

38. Under 21 U.S.C. § 360c(b)(1), the Secretary is authorized to establish panels "[f]or the purpose of securing recommendations with respect to the classification of devices." These panels are exempted from FACA duration limits. *Id.*

39. OBRA § 6103; 42 U.S.C. § 299c(b)(1) ("The Council *shall advise the Secretary*....") (empha-

sis added); *id.* § 299c(b)(2) ("Activities of the Council ... shall include *making recommendations to the [Research Agency]*....") (emphasis added).

40. 42 U.S.C. § 299c(j).

41. *See id.* § 299b–1(a)(1).

938

federal agency lacks power to exempt advisory committees from FACA and, hence, its motive in characterizing a committee's goal may, depending on the circumstances, be suspect. Here, Congress determined that a clinical practice guideline like the *Guideline on Acute Low Back Problems in Adults* should be developed by and for physicians, educators, and health care practitioners and consumers without the retention of any substantive decision-making authority in the federal government;[42] hence, there was no call for advice or recommendations to be given to the federal government.

Accordingly, we affirm the grant of summary judgment to appellees.