**ALUMINUM COMPANY OF AMERICA; Columbia Aluminum Corporation; Elf Atochem North America, Inc.; Columbia Falls Aluminum Company; Intalco Aluminum Corporation; Kaiser Aluminum & Chemical Corporation; Northwest Aluminum Company; Reynolds Metals Company; Vanalco Inc., Plaintiffs–Appellants,**

v.

**NATIONAL MARINE FISHERIES SERVICE; Richard H. Brown; in his official capacity as Secretary of Commerce; U.S. Fish & Wildlife; United States Department of Energy, Through Bonneville Power Administration; Randall W. Hardy, in his official capacity as Administrator of the Bonneville Power Administration, Defendants–Appellees.**

No. 95–35134.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1996.

Decided Aug. 9, 1996.

Paul M. Murphy, James L. Buchal, Ball Janik & Novack, Portland, Oregon, for plaintiffs-appellants.

Michael S. Raab, Mark B. Stern, United States Department of Justice, Washington, D.C., Thomas C. Lee, Office of the United States Attorney, for defendant-appellee National Marine Fisheries Service.

Thomas C. Lee, Office of the United States Attorney, for defendant-appellee Richard H. Brown.

Mark B. Stern, United States Department of Justice, Washington, D.C., Thomas C. Lee, Office of the United States Attorney, for defendants-appellees United States Fish & Wildlife Service, United States Department of Energy, through Bonneville Power Administration, and Randall W. Hardy.

Alan G. Lance, Attorney General, Clive J. Strong, Chief, Natural Resources Division, William S. Whelan, Matthew J. McKeown, Deputy Attorneys General, for Amicus Idaho Dept. of Fish and Game.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, Stephanie L. Striffler, Assistant Attorney General, for Amicus State of Oregon.

Before REINHARDT, KOZINSKI, and FERNANDEZ, Circuit Judges.

Opinion by Judge FERNANDEZ; Dissent by Judge KOZINSKI.

FERNANDEZ, Circuit Judge:

Aluminum Company of America, et al. (DSIs) appeal the district court's grant of summary judgment in favor of the Department of Commerce's National Marine Fisheries Service, et al. (NMFS) in the DSIs' action pursuant to the Federal Advisory Committee Act (FACA), § 3(2), 86 Stat. 770 (1972) (codified as amended at 5 U.S.C. app. 2).[1] The DSIs argue that they are entitled under FACA to participate in certain advisory committee meetings concerning the protection of endangered Snake River salmon. In addition, the DSIs argue the district court abused its discretion in refusing to grant the DSIs' discovery requests and in refusing to enjoin NMFS' reliance upon the advisory committee's work product. We affirm.

## BACKGROUND

The DSIs are various producers of aluminum. They requested permission to participate in the post-judgment conferences conducted in the wake of the district court's judgment in related litigation, *Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 850 F.Supp. 886 (D.Or.1994) (*IDFG I*), vacated as moot, 56 F.3d 1071 (9th Cir. 1995).[2] Those meetings were initially attended by "the relevant federal agencies, the Pacific Northwest states (including Alaska) and the Columbian Basin Indian tribes." The purpose of the meetings was to determine the manner in which NMFS could com-

---

1. DSIs or "Direct Service Industries" are directly served with electricity generated by the Federal Columbia River Power System (FCRPS) and sold to them by the Bonneville Power Administration. *Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 56 F.3d 1071, 1074 n. 5 (9th Cir.1995) (*IDFG II*).

2. The Idaho Department of Fish and Game sued NMFS alleging, among other things, that the federal agency's 1993 biological report, which concluded that the 1993 operations of the Federal Columbia River Power System would not jeopardize the Snake River salmon, violated the Endangered Species Act (ESA), 16 U.S.C. § 1536. See *IDFG I*, 850 F.Supp. at 890–91. The DSIs

intervened as defendants in that litigation. See *id.* at 891. In that case, the district court held that the biological opinion was arbitrary and capricious, in part because NMFS had failed to consider "significant information and data from well-qualified scientists such as the fisheries biologists from the states and tribes" in violation of the ESA, 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14. *IDFG I*, 850 F.Supp. at 900. After the 1993 biological opinion expired, the district court revised its order to direct that action be taken on the biological opinion contained in the 1994–1998 operations plan. *IDFG II*, 56 F.3d at 1074.

ply with the court's judgment, and to then actually comply by receiving information to aid in the drafting of an acceptable 1994–1998 biological opinion. The working groups were created for the purpose of aiding the Principals in their attempts to meet the district court's directions. Those were the Biological Requirements Work Group (BRWG) and the Actions Work Group (AWG).[3]

The DSIs originally requested that NMFS provide them with meeting summaries and documents. They then requested permission to attend and participate in the post-judgment conferences or to meet one-on-one with NMFS, but the requests were not responded to. However, between three and five of the initial eight meetings attended by the Principals were open to nonsovereign participants, including the DSIs. Moreover, the DSIs participated in an additional meeting attended only by them and the federal agencies, and were invited to three public workshops held "to inform and receive comments from, in particular, the non-sovereign court participants." Furthermore, the federal agencies did provide to the DSIs court-ordered summary outlines detailing the topics discussed in closed meetings. NMFS also solicited comments from "all IDFG v. NMFS participants" on the issues raised at various parts of the process and on the draft 1995 Federal Columbia River Power System (FCRPS) Biological Opinion, although it appears that the DSIs declined to comment upon the latter. Finally, the DSIs submitted their own technical data for consideration by the federal agencies.

The DSIs then filed this action against the federal agencies, and alleged that the IDFG v. NMFS parties had formed de facto advisory committees and thus must comply with FACA. The district court denied the DSIs' motion for a temporary restraining order (TRO) and their motion for reconsideration. The court also denied the DSIs' motions to expedite discovery and to compel discovery. The DSIs petitioned the Ninth Circuit for a writ of mandamus, but we denied the peti-

tion. NMFS then filed a motion for summary judgment and the DSIs filed a cross-motion for summary judgment. The district court granted NMFS' motion for summary judgment and the DSIs appealed.

## JURISDICTION and STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

A grant of summary judgment is reviewed de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). The inquiry is "whether the evidence, viewed in the light most favorable to the nonmoving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Id.* Initially, the burden is upon the moving party to inform the court of the basis of its motion and to identify portions of the record which show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The motion may be supported with affidavits or other materials negating the nonmoving party's claim. *See id.* The nonmoving party then must "make a showing sufficient to establish that the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The district court's ruling on the DSIs' discovery motion is reviewed for abuse of discretion. *See Sopcak v. Northern Mountain Helicopter Serv.,* 52 F.3d 817, 818 (9th Cir.1995).

## DISCUSSION

A.  *Compliance with FACA*

■ The DSIs argue that two of the working groups formed during the post-judgment conference process, the BRWG and the AWG, were "advisory committees"

---

**3.** The Principals included, for the most part, the parties to the *IDFG v. NMFS* litigation; that is, the litigation of which *IDFG I* and *IDFG II* were a part. Specifically, the Principals were federal agencies, Idaho Fish & Game, the State of Mon-

tana, the State of Oregon, the State of Alaska, and a number of Indian tribes. Those were either parties or amicus in *IDFG v. NMFS*. Joining them was the State of Washington.

within the meaning of FACA, that is, they were "established and utilized" by the federal government.[4] *See* 5 U.S.C. app. 2 § 3(2)(C). The BRWG's task was to compile technical data and "recommend a range of analytical methods for determining requirements for survival and recovery of listed Snake River salmon" to the Principals. The suggested methods would then be evaluated by NMFS "for use in determining whether federal actions, such as operation of the [FCRPS], are likely to jeopardize the continued existence of listed salmon stocks." The AWG's task was to provide to the Principals "[a] detailed list of all possible FCRPS actions, and a general list grouping those actions in broader categories." In addition, it was to employ tables illustrating the impact and effectiveness of actions and provide "[a] range of FCRPS action scenarios aimed at achieving different goals."

The Supreme Court has cautioned against literal adherence to a dictionary reading of FACA's extremely broad definition of "advisory committee": FACA simply was not "intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452 n. 8, 453, 109 S.Ct. 2558, 2566 n. 8, 2566, 105 L.Ed.2d 377 (1989). As the Court said,

> [A]n entity formed privately, rather than at the Federal Government's prompting ... an entity in receipt of no federal funds and not amenable to the strict management by agency officials ... cannot easily be said to have been "utilized by a department or agency in the same manner as a Government-formed advisory committee."

*Id.* at 457–58, 109 S.Ct. at 2568. The Court also suggested that the fact that the Executive Branch did not consider the group in question-the American Bar Association's Standing Committee on Federal Judiciary-an advisory committee militated against a finding that it was one. *Id.* The District of Columbia Circuit underscored that consideration when it determined that "the govern-

ment has a good deal of control over whether a group constitutes a FACA advisory committee .... it is a rare case when a court holds that a particular group is a FACA advisory committee over the objection of the executive branch." *Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C.Cir.1993). These considerations lead to a conclusion that the committees were not covered by FACA. Before going on, however, we must make a short detour to make an observation.

The Supreme Court was not technically dealing with the question of whether the ABA Committee was established by the President when it decided *Public Citizen*—all agreed that the Committee was not. *See Public Citizen*, 491 U.S. at 452, 109 S.Ct. at 2565. Still, the elements it used to determine the utilization issue smack of facets of the establishment issue. That is not surprising because the Court looked upon "utilized" as a form of "established." Utilized was added to encompass groups which were formed "'for' public agencies as well as 'by' such agencies themselves." *Id.* at 462, 109 S.Ct. at 2571. As the District of Columbia Circuit has put it: "In the Court's delineation ... 'established' indicates 'a Government-formed advisory committee,' while 'utilized' encompasses a group organized by a nongovernmental entity but nonetheless so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Food Chem. News v. Young*, 900 F.2d 328, 332–33 (D.C.Cir.), *cert. denied*, 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 99 (1990) (citations omitted).

We agree with the district court that the BRWG and the AWG were not "groups" formed by, at the prompting of, or solely for the federal government. *See Public Citizen*, 491 U.S. at 446–48, 109 S.Ct. at 2562–63; *Association of Am. Physicians & Surgeons*, 997 F.2d at 913–14. They were groups formed for the purpose of aiding compliance with the district court's order which required the government to "re-initiate consultation

---

4. The DSIs have not argued on appeal that the Principals themselves constituted an FACA advisory committee. They say that is because the issue is moot. At any rate, it is not argued, and

while we do not decide the issue, it is somewhat difficult to perceive how that group of sovereigns thrown together by the *IDPG v. NMFS* lawsuit would be within FACA.

consistent with my findings and [to] complete any re-initiation within 60 days, unless extended by leave of court." *IDFG I*, 850 F.Supp. at 901. As the district court noted, the purpose of the discussions following the *IDFG v. NMFS* judgment was "to better facilitate consideration of credible and relevant scientific evidence and to comply with the other dictates of my March 28 opinion, April 11 order and April 26 judgment." In other words, if anyone prompted the formation it was the district court itself, but the district court is not covered by FACA. *See* 5 U.S.C. app. 2 § 3(3); *id.* § 551(1)(B); *Washington Legal Found. v. United States Sentencing Comm'n*, 17 F.3d 1446, 1448–50 (D.C.Cir.1994).

To put it another way, and to use the language of FACA itself, the working groups simply were not "established" by an agency of the Federal Government. *See* 5 U.S.C. app. 2 § 3(2); *see also ·Food Chem. News*, 900 F.2d at 332–33 (citing *Public Citizen*, 491 U.S. at 457, 461, 109 S.Ct. at 2568, 2570). Rather, the working groups were created by the Principals. Of that there can be little doubt. The DSIs themselves told the district court, "The Principals Committee established the subcommittees." The Principals did that because they wished to expeditiously comply with a court order in the prior litigation. These proceedings were subsequently overseen by the same court through the use of required status reports and post-judgment reports submitted to the court for its approval. The district court remained active in the process and treated it as part of the proceedings over which it exercised control. Indeed, the district court even went so far as to direct when the DSIs must be allowed to enter the process. For example, the DSIs were present when the working groups reported back to the Principals.

Nor does the record show that the groups were funded by the federal government, another factor that the Supreme Court found important when it decided that the ABA committee was not an advisory committee. *See Public Citizen*, 491 U.S. at 457, 109 S.Ct. at·2568.

By the same token, it could not be said that the groups were subject to the management, much less strict management, of federal agency officials. They were not amenable to that management and in that sense could not be said to have been utilized by federal officials. *See Food Chem. News*, 900 F.2d at 332–33. The parties came together because most of their principals, the states and Indian tribes, had won a decision that other principals, NMFS, had to implement. The working groups were certainly not subject to strict management by federal agency officials. As Oregon's attorney rather sententiously put it, "I can state very strongly for the State of Oregon that we are not being controlled in any way." Indeed, it would have been middling strange for the prevailing parties in the litigation to have ceded control to the federal government in discussions whose entire purpose was to force NMFS to take into consideration the states and tribes' views, which NMFS had neglected to do before issuing its 1993 biological opinion. *See also Washington Legal Found.*, 17 F.3d at 1450 (word "utilized" "denot[es] something along the lines of actual management or control of advisory committee"); *Food Chem. News*, 900 F.2d at 332–33.

All of this strongly indicates that, like the ABA committee in *Public Citizen*, the groups we deal with here were not advisory committees—they were neither established nor utilized by a federal agency. However, the DSIs suggest that the groups' issuance of reports indicates that they were advisory committees. They point to *Association of Am. Physicians & Surgeons* for that proposition. *See* 997 F.2d at 913. In that case the court did say "a group is a FACA advisory committee when it is asked to render advice or recommendations, *as a group,* and not as a collection of individuals." *Id.* In addition, the existence of a formal and structured group leans toward a finding of FACA application. *See id.* at 914.

For purposes of determining the applicability of FACA to any given group, the court visualized the range of variations as a continuum: "At one end one can visualize a formal group of a limited number of private citizens who are brought together to give publicized advice as a group." Such a group would tend to be covered by FACA. "At the other end

of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with each other." That group composite could not trigger FACA. *Id.* at 915.

But the discussion must be taken in context because those factors can hardly be controlling and were not intended to be. For example, no doubt the ABA committee gave advice as a group, but that did not implicate FACA. *See Public Citizen,* 491 U.S. at 452 n. 8, 453, 109 S.Ct. at 2566 n. 8, 2566. In fact, the discussion in *Association of Am. Physicians & Surgeons* simply points toward an answer to the question of whether an agglomeration of people is a committee at all, much less an advisory committee. Once it is decided that the group is a conglomeration rather than an agglomeration one can decide if it is of the advisory type within the meaning of FACA.

We also recognize that, as the DSIs argue, Title 41 C.F.R. § 101–6.1004(i) warns that "a group would be covered by the Act when an agency accepts the group's deliberations as a source of consensus advice or recommendations." The DSIs assert that NMFS cites the BRWG Report twenty times in its Proposed Recovery Plan. We think that is of little import even though it may lend some hindsight support to an argument that the group's meetings were subject to FACA. The Supreme Court has held that the regulations are subject to "diminished deference." *Public Citizen,* 491 U.S. at 463 n. 12, 109 S.Ct. at 2571–72 n. 12. Therefore, any argument based upon their text is not dispositive. Moreover, the Supreme Court has "made clear that [the] mere subsequent and optional use of the work product of a committee by a federal entity does not involve utilization under FACA." *Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929, 933 (D.C.Cir.1995), (citing *Public Citizen,* 491 U.S. at 452, 109 S.Ct. at 2565), *cert. denied,* —— U.S. ——, 116 S.Ct. 910, 133 L.Ed.2d 841 (1996). That is sensible because FACA must operate prospectively and not retroactively. A person trying to obey the law cannot wait to see if the product is used before he decides whether his group is covered by FACA.

In fine, the groups in question were designed to present the victorious entities' positions to their erstwhile opponents and to win approval of those positions in the future. That is not advice, except in the sense that one advises an opponent to mend its ways. For FACA purposes, their opponent neither established nor utilized them. FACA was not violated.

## B. *Evidentiary Issues*

■ In deciding this case we have, of course, relied upon the record. The DSIs complained that NMFS did not submit affidavits with its summary judgment motion. That is true; NMFS simply asked the district court to take judicial notice of the proceedings and files of the *IDFG v. NMFS* case. In so doing, NMFS did not distinguish between material which can be judicially noticed and facts which cannot be. Nevertheless, there is no "express or implied requirement ... that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corporation,* 477 U.S. at 323, 106 S.Ct. at 2553. More importantly, the materials upon which we rely were submitted by the DSIs themselves in opposition to the motion of NMFS and in support of their own motion for summary judgment. Moreover, the DSIs submitted declarations, which we have considered.

Perhaps the DSIs would like to have the documents considered only if they happen to support the DSIs' own position. But that is not how evidence works. Once admitted, the evidence can be considered by the court and may or may not benefit the party who tendered it. In short, both of the parties asked the district court to consider the information for purposes of the summary judgment motions. We see no error in the court's doing exactly that.

The DSIs also complain because the district court did not allow them to have further discovery. The district court denied that discovery because, it said, the disclosed reports and other information provided sufficient knowledge about the nature of the committees and their processes, and the DSIs

had not shown that further discovery would lead to relevant or admissible information.

We can imagine scenarios in which relevant evidence would have been elicited. For example, despite protestations to the contrary, perhaps discovery would uncover strong federal control of the whole process. But the district court, which was closer to the development of this case and *IDFG v. NMFS* than we, was not convinced that there was more buried treasure to be dug out. Upon reflection, the DSIs have reached the same conclusion. At oral argument before us, counsel said: "I don't want discovery.... I don't know what will happen if you just give us discovery.... We don't need them to say anything...."

We, therefore, are unable to say that the district court abused its discretion when it denied further discovery to the DSIs. Moreover, that concession underscores the fact that the district court did not need to take. more evidence before it decided this case.

## CONCLUSION

Having been found in violation of its duties under the ESA and smarting under the lash of district court orders to move quickly, NMFS agreed to enter into a consultative process with its adversaries. That included the formation of groups under the ultimate control and direction of the district court, which were designed to expeditiously bring the now-chastened federal agencies back into compliance with the law and to, by the way, save the salmon. We now hold that under the facts of this case NMFS did not fall victim to Scylla while avoiding Charybdis. It did not inadvertently establish or utilize an "advisory committee" while attempting to adhere to the demands of the ESA and the court. Had NMFS violated FACA, it would again come under the judicial lash: as it is, it need not thole that thrashing.

**AFFIRMED.**

KOZINSKI, Circuit Judge, dissenting.

According to the majority, "if anyone prompted the [working groups'] formation it was the district court itself." Maj. op. at 10. But the district court only ordered the Na-

tional Marine Fisheries Service (NMFS) to "re-initiate" some form of consultation. *Idaho Dep't v. National Marine Fisheries Serv.*, 850 F.Supp. 886, 901 (D.Or.1994), *remanded by* 56 F.3d 1071 (9th Cir.1995). As the court made clear, the method of compliance was left to NMFS: "Although I have encouraged all parties to take on a more conciliatory approach to the overall problem, I left the specific method of compliance with the judgment to the federal defendants." District Court's Opinion and Order Denying Motion to Compel, at 9 (D.Or. Aug. 10, 1994). The district court also noted: "As the government points out, it could have met with each individual state and Indian tribe but chose not to for the sake of procedural expediency." District Court's Opinion and Order Granting Defendant's Motion for Summary Judgment, at 18 (D.Or. Dec. 7, 1994).

Even if the district court *had* ordered NMFS to create the working groups, why would it matter? A court cannot relieve an agency of its obligation to comply with statutory commands. For example, courts occasionally order agencies to revise or promulgate regulations, *see, e.g., Newman v. Chater*, 87 F.3d 358, 362 (9th Cir.1996); this does not give the agencies carte blanche to ignore the Administrative Procedure Act. Similarly, the Federal Advisory Committee Act (FACA) spells out certain procedures an agency must follow when it creates an advisory committee. That the agency does so under court order should make no difference.

The majority loses its way by inquiring into NMFS's purpose for employing the working groups. Maj. op. at 10–11. Such an inquiry is only apposite when the government is utilizing a group independently established by a private entity, such as the ABA's Standing Committee on the Judiciary. *See Public Citizen v. Department of Justice*, 491 U.S. 440, 462–63, 109 S.Ct. 2558, 2570–71, 105 L.Ed.2d 377 (1989). Were the rule otherwise, FACA would burden any and all contacts between the federal government and private groups; a "rule of reason" makes perfect sense. But intent is not a factor where, as here, the federal agency actually creates the committee.

Where an agency sets up an advisory committee, the agency has "established" that committee for purposes of FACA. If FACA does not apply in such a case, it never will. I respectfully dissent.